UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| SARA S. WESSEL, | ) |
| | ) |
|        Plaintiff, | ) |
| | ) |
|     v. | ) Case No.: 4:14-cv-00055-SEB-DML |
| | ) |
| CAROLYN W. COLVIN, Acting | ) |
| Commissioner of the Social Security, | ) |
| Administration, | ) |
| | ) |
|       Defendant. | ) |

## Report and Recommendation on
## Complaint for Judicial Review

This matter was referred to the Magistrate Judge under 28 U.S.C.

§ 636(b)(1)(B) and Fed. R. Civ. P. 72(b) for a report and recommendation as to its

appropriate disposition. As addressed below, the Magistrate Judge recommends

that the District Judge REVERSE AND REMAND the decision of the Commissioner

of the Social Security Administration that plaintiff Sara S. Wessel is not disabled.

## **Introduction**

Ms. Wessel applied in June 2011 for Disability Insurance Benefits (DIB) and

Supplemental Security Income disability benefits (SSI) under Titles II and XVI,

respectively, of the Social Security Act, alleging that she has been disabled since

April 22, 2011. Acting for the Commissioner of the Social Security Administration

following a hearing on March 22, 2013, administrative law judge James R. Norris

issued a decision on April 2, 2013, in which he found that Ms. Wessel is not

disabled. The Appeals Council denied review of the ALJ's decision on April 18,

2014, rendering the ALJ's decision for the Commissioner final.  Ms. Wessel timely filed this civil action under 42 U.S.C. § 405(g) for review of the Commissioner's decision.

Ms. Wessel's assertions of error concern the ALJ's treatment of the evidence of her severe migraine headaches.  She contends the ALJ discounted their severity without providing any logical reasons for doing so and failed properly to account for them in his RFC.  Ms. Wessel made a convincing case in her opening brief that the ALJ committed in this case the same errors in evaluating her migraines as did an ALJ who evaluated a claimant's history of migraines in *Moon v. Colvin,* 763 F.3d 718 (7th Cir. 2014).  In *Moon,* the Seventh Circuit reversed and remanded the ALJ's decision denying benefits.  Yet the Commissioner had nothing to say about *Moon;* she completely ignored the decision and its similarities to this case.

As explained below, the court finds that the ALJ's decision lacks a logical bridge between the evidence of Ms. Wessel's migraines and his decision that she is not disabled.

The court does not, however, fault the ALJ's failure to address the fact Ms. Wessel is an Indiana Medicaid recipient.  Though Ms. Wessel's brief states that "Wessel has been found eligible, *and therefore disabled,* by the Medicaid program of Indiana" (Dkt. 15 at p. 12; emphasis added), there is no evidence that Ms. Wessel was found disabled under Indiana's Medicaid program.  There is no evidence Ms. Wessel's receipt of Medicaid benefits is at all tied to a disability determination.  The court will not further address this issue.  Ms. Wessel may, on remand, provide

evidence (if any exists) that she was found disabled for purposes of Indiana's Medicaid program and submit to the SSA the relevant records supporting any such disability determination.

### Standard for Proving Disability

To prove disability, a claimant must show she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A) (DIB benefits; 42 U.S.C. § 1382c(a)(3)(A) (SSI benefits).[1]  Ms. Wessel is disabled if her impairments are of such severity that she is not able to perform the work she previously engaged in and, if based on her age, education, and work experience, she cannot engage in any other kind of substantial gainful work that exists in significant numbers in the national economy.  42 U.S.C. § 423(d)(2)(A).  The Social Security Administration ("SSA") has implemented these statutory standards by, in part, prescribing a five-step sequential evaluation process for determining disability.  20 C.F.R. § 404.1520.

---

[1]  Two programs of disability benefits are available under the Social Security Act:  DIB under Title II for persons who have achieved insured status through employment and withheld premiums, 42 U.S.C. § 423 *et seq.*, and SSI disability benefits under Title XVI for uninsured individuals who meet income and resources criteria.  42 U.S.C. § 1381 *et seq.*  The court's citations to the Social Security Act and regulations promulgated by the Social Security Administration are those applicable to DIB benefits.  For SSI benefits, materially identical provisions appear in Title XVI and in the Code of Federal Regulations.

Step one asks if the claimant is currently engaged in substantial gainful activity; if she is, then she is not disabled.  Step two asks whether the claimant's impairments, singly or in combination, are severe; if they are not, then she is not disabled.  A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  The third step is an analysis of whether the claimant's impairments, either singly or in combination, meet or medically equal the criteria of any of the conditions in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.  The Listing of Impairments includes medical conditions defined by criteria that the SSA has pre-determined are disabling, so that if a claimant meets all of the criteria for a listed impairment or presents medical findings equal in severity to the criteria for the most similar listed impairment, then the claimant is presumptively disabled and qualifies for benefits.  *Sims v. Barnhart,* 309 F.3d 424, 428 (7th Cir. 2002).

If the claimant's impairments do not satisfy a listing, then her residual functional capacity (RFC) is determined for purposes of steps four and five.  RFC is a claimant's ability to do work on a regular and continuing basis despite her impairment-related physical and mental limitations.  20 C.F.R. § 404.1545.  At the fourth step, if the claimant has the RFC to perform her past relevant work, then she is not disabled.  The fifth step asks whether there is work in the relevant economy the claimant can perform, based on her vocational profile (age, work experience, and education) and her RFC; if so, then she is not disabled.

The individual claiming disability bears the burden of proof at steps one through four. *Bowen v. Yuckert,* 482 U.S. 137, 146 n.5 (1987). If the claimant meets that burden, then the Commissioner has the burden at step five to show that work exists in significant numbers in the national economy the claimant can perform, given her age, education, work experience, and functional capacity. 20 C.F.R. § 404.1560(c)(2); *Young v. Barnhart,* 362 F.3d 995, 1000 (7th Cir. 2004).

### Standard for Review of the ALJ's Decision

Judicial review of the Commissioner's (or ALJ's) factual findings is deferential. A court must affirm if no error of law occurred and if the findings are supported by substantial evidence. *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001). Substantial evidence means evidence that a reasonable person would accept as adequate to support a conclusion. *Id.* The standard demands more than a scintilla of evidentiary support, but does not demand a preponderance of the evidence. *Wood v. Thompson,* 246 F.3d 1026, 1029 (7th Cir. 2001).

The ALJ is required to articulate a minimal, but legitimate, justification for his decision to accept or reject specific evidence of a disability. *Scheck v. Barnhart,* 357 F.3d 697, 700 (7th Cir. 2004). Although the ALJ need not address every piece of evidence in his decision, he cannot ignore a line of evidence that undermines the conclusions he made, and he must trace the path of his reasoning and connect the evidence to his findings and conclusions. *Arnett v. Astrue,* 676 F.3d 586, 592 (7th Cir. 2012); *Clifford v. Apfel,* 227 F.3d 863, 872 (7th Cir. 2000).

## Analysis

### I.    The ALJ's Sequential Findings

Ms. Wessel was born in May 1982 and was 28 years old at the alleged onset of her disability in April 2011.  She was 30 years old at the time of the ALJ's decision.  Ms. Wessel has a high school education and most recently worked as a teacher's assistant in elementary special education classes.  She alleged her disability stemmed from knee impairments (she had had three surgeries to address knee problems), depression, anxiety, and migraine headaches.

The court's discussion and analysis of the ALJ's findings focus on the evidence surrounding Ms. Wessel's migraine headaches because Ms. Wessel's assertions of error are focused there.  She does not argue that there is a lack of substantial evidence to support the ALJ's evaluation of the severity of her knee problems and mental health impairments, including his accommodations in the RFC for their limiting effects.

At step one, the ALJ determined Ms. Wessel had not engaged in substantial gainful activity since her alleged onset date.  At step two, he identified the following severe impairments:  residual effects post multiple knee surgeries, obesity, chronic migraines, depression, and anxiety.  At step three, he found no listings were met or medically equaled.  That decision, at least with respect to Ms. Wessel's physical problems due to her knee impairments and obesity and with respect to her depression and anxiety, was were supported by expert testimony at the hearing. Dr. Anthony Francis, a board-certified orthopedic surgeon and neurosurgeon,

testified that listing 1.02 (major dysfunction of a joint) was not met or medically equaled.  Dr. Don Olive, a clinical psychologist, testified that the mental health listings were not satisfied. Regarding Ms. Wessel's headaches, the ALJ stated he evaluated the evidence against the neurological listings at section 11.00 of the Listing of Impairments "and no impairment whose criteria are met or equaled is found." (R. 19).

The ALJ next determined Ms. Wessel's residual functional capacity (RFC). He limited Ms. Wessel to sedentary work, finding she could sit 6-8 hours in an 8-hour work day and stand or walk, in combination, only up to 2 hours in an 8-hour work day.  His RFC determination also includes findings that Ms. Wessel "should avoid driving and can perform tasks that are simple and repetitive in nature.  She should avoid work that is fast-paced or that requires forced productivity, with no more than occasional contact with large groups of peers and the public." (R. 21). These latter restrictions mirror those suggested by Dr. Olive (the psychologist) in his hearing testimony.

Dr. Olive addressed Ms. Wessel's mental health treatment, diagnoses, and psychological evaluations (which referred to her impairments variously as depression, a dysthymic disorder, unspecified anxiety disorder, and bipolar disorder). (*See* R. 59-60).  He then opined:  "I would limit her to unskilled work," "no more than occasional contact with the general public," and perhaps a similar limitation with peers if there is a large work force (the record indicates her "[a]nxiety tends to increase in large groups"). (R. 60).  He further stated she should

7

not be employed as a driver or required to work a job that has productivity or fast-paced work requirements because those demands and related stress are contraindicated by her mental impairments and side-effects of her medications.  (R. 61-62).

These is nothing in the RFC that addresses limitations because of Ms. Wessel's migraines.

At step four, the ALJ found Ms. Wessel is not capable of performing her past relevant work which was skilled and at a higher exertional level than the RFC. But based on the RFC and testimony of a vocational expert, the ALJ determined Ms. Wessel is capable of meeting the demands for the jobs of (a) table worker, (b) cutter and paster in the publication business, (c) surveillance system monitor, (d) pari-mutuel ticker checker, and (e) order clerk, which exist in significant numbers within the region and national economy.  Accordingly, the ALJ concluded at step five that Ms. Wessel is not disabled.

## <u>Analysis</u>

## I.    **The medical records are replete with references to Ms. <u>Wessel's migraines and to treatment for them.</u>**

Ms. Wessel's complaints to medical providers about persistent migraine headaches and her physicians' attempts to determine a cause and appropriate treatment heavily populate the record.  Her medical histories, no matter the medical ailment for which she was seeking treatment, consistently list a history of migraine headaches.  (*E.g.,* R. 273, dated 2/17/2010, regarding treatment for bilateral knee pain and noting, "The patient's past medical history is significant for

migraines."; R. 268, dated 1/27/2011, regarding treatment for recurrent ear infections and noting, "The patient also has a significant history for migraine headaches."). In April 2011 (after Ms. Wessel was approved for Medicaid), she told her care provider she wanted to discuss allergies as a possible factor in her migraines. (R. 306). (Her mother suffered from migraines and, according to Ms. Wessel, the mother's were related to allergies). During that month, she was referred to an allergist who, after examination and some pinprick and intradermal testing, stated she doubted if allergies were "playing a significant role in the causation of her migraines." (R. 272).

Ms. Wessel also had in April 2011 an initial appointment with a neurologist (Dr. Moore) to investigate her headaches. (R. 254). He noted Ms. Wessel reported a medical history of migraines since age eight and a current occurrence rate of one per week. He also noted the results of a brain MRI from March 2011 was normal (which had been conducted when Ms. Wessel had gone to the emergency room and complained of hearing loss, R. 322). Dr. Moore prescribed a prophylactic migraine medication (Topamax) and different medication to be taken at the onset of a migraine. Ms. Wessel had three follow-up appointments with Dr. Moore, in August 2011, September 2011, and November 2011. By the last visit, Ms. Wessel reported still experiencing migraines (two or more per week now) and a lack of relief from medication. Dr. Moore's examinations remained normal, and he increased her Topamax dosage each time and changed other medications (*See* R. 509-515).

Ms. Wessel began seeing a new neurologist for treatment of her migraine headaches in January 2012.  Ms. Wessel had been referred to this doctor, Dr. Ridel, by her primary care provider.  Significantly, the records from Dr. Ridel's treatment had not been reviewed by any of the medical experts, including those who testified at the hearing.  Dr. Ridel recommended a sleep study, which Ms. Wessel underwent and which was found to show normal results.  He increased her dosage of Topamax two more times and prescribed a different medication for "abortive therapy"— medication to get rid of a headache when it occurred.  Finally, Dr. Ridel recommended botox injections, which Ms. Wessel underwent in August 2012 and again in February 2013.  (*See* R. 584-601).  Ms. Wessel reported to Dr. Ridel that after the first injections, her headaches had decreased from 20 days per month to 10 days per month, but had worsened as of mid-September 2012.  In December 2012, Ms. Wessel told Dr. Ridel she was having more than 20 headache days per month. (R. 587, 590).

## II.   The ALJ discounted the evidence of Ms. Wessel's headaches because her neurological exams were normal.

The ALJ's discussion of Ms. Wessel's migraine evidence for purposes of his RFC determination includes numerous statements that her neurological testing was "normal."  He said:

- "As for the claimant's migraines, CT scans of the head have been unremarkable."[2]  (R. 24).

---

[2]     The medical record includes results from one CT scan.

- "Dr. Moore's clinical findings . . . revealed normal functioning of the cranial nerves . . ., with normal eye movement bilaterally . . . [and] globally normal sensory function and motor strength."  (R. 25).

- "Dr. Moore also indicated that her recent MRI shown [sic] normal brain function."  (R. 25).

- In January 2012, Dr. Ridel found no focal deficits upon neurological examination.  In February 2012, "the neurologic examination was still unremarkable."  In September 2012, "neurologic examinations remained normal." (R. 25).

The ALJ's discussion of Ms. Wessel's migraines in his credibility assessment states similarly that:  "As for her chronic migraines, the evidence shows her neurologic examinations have been grossly normal" and "diagnostic imaging has been routinely normal."  (R. 27-28).

Ms. Wessel argues that the ALJ's apparent reliance on a normal CT scan and an MRI as well as normal or unremarkable neurologic examinations to support omitting any accommodations for Ms. Wessel's migraine headaches lacks a logical connection.  The court must agree.  The ALJ found that Ms. Wessel's migraines were a severe, medically-determinable impairment but did not specifically discuss how they affect her ability to work or why no accommodations were appropriate to address their effects—except his expression of an apparent belief that they must not be as bad as Ms. Wessel said they were because no tests confirmed their rate of occurrence or severity.  As the court remarked in *Moon v. Colvin,* 763 F.3d 718 (7th

Cir. 2014), MRIs and CT scans are tools to rule out possible causes of migraines but do not confirm the absence of migraines or test their severity.  *Id.* at 722.  The same might be said of the interplay between neurologic examinations by Drs. Moore and Ridel and Ms. Wessel's migraines, or at least the ALJ cited no expert opinion that the normal neurologic examinations meant that Ms. Wessel does not truly experience the number or severity of migraines she reported.  *See id.* ("ALJs are required to rely on expert opinions instead of determining the significance of particular medical findings themselves.")

Nor does the ALJ's reliance on the hearing testimony of Drs. Olive and Francis provide the necessary logical link.  Dr. Olive expressly based his testimony on Ms. Wessel's depression, anxiety, and bipolar disorder.  Dr. Francis focused his testimony on Ms. Wessel's knee problems and associated pain.  (R. 52).  With respect to Ms. Wessel's migraines, Dr. Francis stated there was not a specific listing for migraine headaches but depending on the frequency, "they can sort of equal either a less than sedentary RFC or some other listing."  (R. 52).  He continued, "But I don't have a frequency on that other than the claimant's had problems with [migraines]."  (*Id.*)  Dr. Francis had not reviewed any of the records from Ms. Wessel's treatment by Dr. Ridel but agreed that if she is having "real migraines 20 days a month, that's not compatible with competitive employment."  (R. 57).  It may also medically equal a listing, as Dr. Francis suggested.[3]

---

[3]      The ALJ stated that in assessing Ms. Wessel's headaches under step three, he reviewed the Neurologic Listings under 11.00 "and no impairment whose criteria are met or equaled is found."  That analysis is perfunctory, given the state of the

The ALJ did not discuss whether he believed or disbelieved Ms. Wessel about the frequency and severity of her migraine headaches except to rely on the absence of confirming neurologic tests or scans such as a CT scan or MRI and to state she experienced some relief after the first botox injections.  (Ms. Wessel had told her doctor she was still experiencing 10 headaches a month after the first round of botox injections, a matter not addressed by the ALJ).  The omission of a discussion regarding the frequency of Ms. Wessel's migraines and their effects is a crucial absence from the ALJ's decision, both for purposes of step three (whether the migraines medically equal a listing) and the RFC.  The court does not suggest the ALJ is required to believe Ms. Wessel about their frequency and effects, but he must tackle the issue directly and provide his reasons, without the near-exclusive reliance on the lack of supporting neurologic tests and scans.

The ALJ's opinion in this case, with respect to his analysis of the evidence of Ms. Wessel's migraine headaches and their effects on her functioning, suffers from the same sort of shortcomings the Seventh Circuit found in *Moon*—a seeming demand for scans or tests to prove the existence of the migraines, a failure to address the frequency and severity of the migraines in connection with the RFC, and a lack of appropriate explanation for a disbelief of the claimant's contentions

---

administrative record. There is nothing in the record indicating a physician evaluated Ms. Wessel's headaches and the pertinent medical records to determine whether they medically equaled a listing.  Of particular importance, no medical expert had reviewed Dr. Ridel's records, including the botox treatment.  As noted, Dr. Francis stated he did not evaluate whether the migraines medically equaled a listing.

regarding their frequency and severity.  Just like the result in *Moon,* the court should reverse and remand the Commissioner's decision in this case.

### Conclusion

For the foregoing reasons, the Magistrate Judge recommends that the District Judge REVERSE AND REMAND the Commissioner's decision under sentence four of 42 U.S.C. § 405(g).

Any objections to this Report and Recommendation must be filed in accordance with 28 § U.S.C. 636(b)(1) and Fed. R. Civ. P. 72(b).  The failure to file objections within fourteen days after service will constitute a waiver of subsequent review absent a showing of good cause for that failure.  Counsel should not anticipate any extension of this deadline or any other related briefing deadlines.

IT IS SO RECOMMENDED.


Dated:  August 4, 2015

_____
Debra McVicker Lynch
United States Magistrate Judge
Southern District of Indiana



Distribution:

All ECF-registered counsel of record by email through the court's ECF system